We have six cases on our docket this morning, five set for oral argument. We'll need to take a break, a long break probably, after the second case. There's a death penalty matter that needs consideration by the full court this morning. So I'm not quite sure how long we need to recess then, but we'll go ahead and hear two cases. Can you hear me? This is a big courtroom and I don't have a hog-calling voice as my junior high teachers told me. Oh, this is the microphone, this bar here. Okay, I didn't see a mic. Okay, good. Okay, we'll go ahead with the first case. Cooper v. US Dominion. Mr. McGuire. Are you ready? Good morning. May it please the court. My name is Robert McGuire and I represent the eight individual plaintiffs who are appellants in this case, Jennifer Cooper et al. I intend to reserve time if possible for rebuttal, but with that, I'll begin. This case is not, first of all, the case about the outcome of the 2020 presidential election. This country can survive a disputed election and it has done so before, but what the country cannot survive so easily, at least not survive and continue to be the country that we all believe it to be, is a justice system that blinds itself to the intimidation of witnesses, especially when that intimidation is done on behalf of the people. On behalf of the government. And that is what this case is about. Witness intimidation, first and foremost, by Dominion, but secondly, on behalf of the government. Dominion, as you know, sent letters to my clients, threatening them, essentially with litigation, implicitly threatening with litigation, demanding that they cease and desist, defaming Dominion, requiring that they retract, requiring that they preserve all communications that might be relevant to Dominion's claims, which were not specified. And it says it did so because these plaintiffs had written affidavits that were attached to lawsuits that were brought against the officers of the state of Michigan following the 2020 general election. Now, these were pretextual claims by Dominion. It had no reason to send anything to these plaintiffs. None of their affidavits said anything about Dominion. Dominion did not, was not a party to the lawsuits that the affidavits were attached to. It didn't seek to intervene in the lawsuits. It had no possible defamation claim against the defendants because their affidavits didn't mention Dominion. And because even if they had, they're absolutely privileged under the litigation privilege. So the pretext of document preservation is belied not only by these facts, but also by the fact that Dominion, which Dominion admitted in its answer brief, that it never contacted the plaintiffs again. So Dominion had no reason to send these letters to the plaintiffs apart from serving the interests of its patron, which was the government of the state of Michigan. The government of the state of Michigan was the defendant in those lawsuits. Counsel, do you, what is your authority to support this notion that pre-litigation correspondence, what seems like fairly standard pre-litigation obligations, constituted an injury of common law? This court's in-bank decision in Cartoons held that a cease and desist letter could give standing to bring a lawsuit. In that case, that was a pre-litigation correspondence between two private companies and one company received a letter. All of its complaints, all of its claims in its lawsuit against the sender of the letter were based on the allegations in the letter, not on anything else. And when they sued, Cartoons said, this is normal litigation behavior. We can't resolve our dispute with them unless we tell them that we're going to sue them for doing X, Y, or Z. And that, even though it was pre-litigation behavior, there was no immunity attached to the fact that it was pre-litigation behavior. Instead, the fact that the recipient of the letters was threatened with litigation gave them an injury that was sufficient for standing, which allowed them to bring their lawsuit. And by analogy, the same thing is true here, because these litigants, these plaintiffs received letters that essentially accused them of wrongdoing and threatened them with litigation, saddled them with the burdens of preserving documents and silencing themselves. And all of those... How did they have to silence... Can you explain that? Why did they have to silence themselves, and how did they silence themselves? Well... And what was alleged in the complaint about that? So, in the complaint, there are several allegations that the plaintiffs did silence themselves as a result of the letters. The letters on their face say that you should stop taking part in defaming the Dominion. What about... But how did it silence them from non-defamatory statements, any type of statements? Well, that's a great question. The reason that the letter caused them to silence themselves when they were saying non-defamatory things is because they received the letters after saying non-defamatory things. Dominion itself admits, admitted both in its motion to dismiss and address to this court, that the affidavits didn't mention Dominion. So, how could Dominion have been accusing the plaintiffs in the letters of taking part in defaming Dominion unless it thought something that they were saying was what it objected to? And so, because what Dominion wanted them to do was to cease and desist from something which they knew was not defamatory, because they didn't even know who Dominion was in certain cases, then the obvious effect on reasonable people is to circumscribe what you're going to say. Because if you're being told to be quiet when you're not saying something offensive, that's going to induce caution in any reasonable person, especially when the cause... Is there some place in the complaint where you alleged that the plaintiffs didn't make some statement because they'd been told to be quiet? There is now... Are we speculating that this was the effect on them? It is expressly alleged in the complaint that they silenced themselves because of the letters. I don't believe it says any particular statement. In general? Yes. Okay. Yes. But I think it's important to emphasize that them silencing themselves is only one of the injuries that they suffered when they received the letters. What other injuries? I think you pointed to six different intangible injuries, or at least that's how they were reframed by defendants. Which of those injuries would you say are your stronger allegations as far as standing? I think they're all fairly on the same page. The one that I think we led with was that they were confused and distressed about being accused of wrongdoing. And the reason why I would say we led with that and why I think it might be considered the strongest is because it mirrors exactly the plaintiff in TransUnion, the Supreme Court case in which the Supreme Court held that Plaintiff Ramirez, who had been confused and distressed, in those exact same words, upon receiving a letter from a credit reporting agency saying that he was on a terrorist watch list, he felt confusion and distress. That's the same confusion and distress that our plaintiffs felt when they received letters from Dominion accusing them of taking part in defaming Dominion. Didn't we sort of temper that conclusion in Shields? Speak to that. Yes. This Court did say in Shields that confusion and distress is not enough without a command to do something. But in this case, there was a command to do something. The letters not only sent the recipients into confusion and distress, it also required them to immediately suspend deleting documents, immediately begin to preserve all communications that they might have had about election improprieties, including ones that had nothing to do with Dominion, because the scope of the cease and desist and preservation demands were very large. They were very broad. They didn't just limit themselves to things about Dominion. The cease and desist letter specifically said preserve anything related to, and in the long list of things that they were related to, there were things like allegations of election irregularities, anything about the 2020 election. So Dominion, unlike in TransUnion where it was simply confusion and distress, Dominion's letter also required that the recipients had to do something, and those things were preserving documents, incur the costs of doing that. And did they allege that they did that? Well, they didn't allege. I'm not sure if there's an allegation that they did preserve documents, but they did try. Did they actually take some action to preserve documents, and was that alleged in the complaint? I'm not sure if that specific allegation that they did that is in the complaint, but there is a presumption that people obey the law, and Dominion invoked the law against the spoliation of evidence and destruction of evidence, and the courts presume that people follow the law. So in this case, given that Dominion issued a demand, the question is not really for standing purposes whether they actually did, whether they alleged that they did. Well, it is if you're relying on fear and confusion and that line of injury. Well, I think the way you would have to plead that you actually took action if that's the way you're distinguishing the rule in Shields as it applies to you. I think I would disagree to the extent that I believe the rule in Shields was that the communication can't just put you into fear and distress. It also has to require you to do something. But Shields doesn't speak about following through on that requirement or showing that you actually did do something. It just says that the demand has to be more than just something scary. It has to be something that actually requires you to do something. And in this case, Dominion definitely demanded that they do something, demanded that they stop taking part in defamation, which they weren't doing, and any reasonable person would interpret that as constraining their speech. So they had to constrain their own interest in speaking about whatever it was that might have triggered this letter. And second, they had to preserve all of their documents and incur the cost to do that. Now, whether they actually did it or not is not necessarily, I think, part of the Shields test. I think the Shields test looks at whether you're demanded to do something more than simply get information that scares you or frightens you or puts you into confusion. So the other injuries, I believe, that the plaintiff suffered was, you know, Shields talks about confusion and distress, but Shields is only really addressing one of the kinds of injuries that the demand to preserve did. The demand to preserve was a demand to take action, and that action was accompanied by an expressly articulated consequence. Otherwise, you'll be liable for destruction of evidence. So this is, it fits into some of the other cases that the Tenth Circuit has decided, where if you are told to do something and you have to do it under threat of consequence, that is compulsion. And we listed a number of cases in the brief, in the opening brief, that deal with compulsion. Don't those require government compulsion? What was the government compulsion here? Many of them, the cases that we cited involve government. They do involve government edicts. What was the government edict here? Well, so first of all, I don't believe that a government edict is necessary under those cases. Those cases did involve governments, but the principle that they stood for was that if you are required to do something under penalty of consequence, it shouldn't be an injury or not an injury, depending upon who's imposing the consequence. Can you point to any case where there was not a government edict or government compulsion alleged? Well, cartoons, I think, is, cartoons is a case that I think fits. Is that compulsion? Well, it's, it was compulsion because it was a cease and desist letter. So it's the same basic thing. It's do this or suffer a consequence. And that threat is what makes it compulsion. It's the threat of consequence that makes it compulsion. And in cartoons, it was a private company sending a letter. Analogously, though, there's no, I don't think there's a real principle basis for distinguishing who is compelling you as a factor that determines whether you're injured or not by compulsion. The issue is really the definition of what's an injury in fact under all the standing cases. And that's an injury in fact is the invasion of a legally protected interest. It doesn't matter who the invader is. It matters that you have an interest that has been invaded. And that is what happens, that's what happened when Dominion demanded that these people preserve documents, cease speaking, and things like that. Another really good case that, from this circuit, is the Henry Special Grand Jury 89-2. That was a case where the court recognized that you can be injured if your interest in expression, your interest in speaking is infringed, even if you don't have a First Amendment claim, which they didn't have in that case. And so I'm very short on time, and I'd like to reserve a little bit for rebuttal if I could, so I will stop there. Well, we never got to the merits. Yes. I'm happy to entertain any questions. I think we need to address those. Yes. Where's your RICO injury here? The RICO injury is, well, first of all, we pled damages, which are the cost. The most obvious RICO damage is a small one, but it's the cost that these people incurred in order to protect themselves at home after being threatened with. There was no threat of physical injury where they would need home security. That's quite a stretch, isn't it? I don't think it's a stretch. I think the Supreme Court has said that courts do not have to operate with a naivete that ordinary citizens lack, and I think this is a situation where if you're about to be made famous by a billion-dollar corporation that is going after bigger fish than you in the news, and they're giving your name to the Washington Post, and they're doing a PR campaign to try and stop people, intimidate people from criticizing the election, it is not unreasonable for you to believe that consequences will follow, and those consequences in this day and age anyone who's famous knows can be physical danger. If you're made famous against your will, that brings risks, and it's a foreseeable consequence of Dominion threatening people with that kind of exposure that they would have to incur costs to protect themselves. It's just a foreseeable... That would expand RICO standing awfully broadly. I'm trying to think of a case where you couldn't make that argument. Well, if we're talking about... To show a RICO injury, because that's really the only injury that fits the RICO requirements. Do you agree with that? Well, no, I think... The fact that they spend money getting home security? I think there are also costs associated with the document preservation. The document preservation letters insisted that you have to preserve all of your documents indefinitely, including any companies that you control, and several of these plaintiffs had small businesses that would have had documents. Small businesses would have been swept into that. In the proceedings in district court, did you allege that injury as a RICO injury? We did not allege it as a RICO injury, no, but we included... Don't you have to argue why there was a RICO injury to the district court and bring that to the attention of the court if you're going to rely on it here? Well, I think we... The district court never reached the merits of the RICO pleading. Right, but if you're making an argument in support of a RICO injury here and you didn't argue that in district court, you've got a tough road to hoe to prevail on that. I would say if this was the motion for summary judgment stage, absolutely correct, but given that we're at the motion to dismiss stage where the complaint is meant to be construed in our favor and all reasonable inferences are supposed to be drawn in our favor... Yeah, but you have to make a legal argument. You have to alert the district court what to look at when it's deciding whether it's a RICO injury, and we can't fault the district court for failing to consider something that was not argued to it. That's the problem here. It's a procedural issue, but it's a very important procedural issue. I think that is one of the reasons why the district court should be given another opportunity to actually rule on the merits because it didn't rule on the merits of the pleading for any of these counts except count two, and RICO's complex to plead, and there are certainly arguments that we could make on lots of elements of RICO, not just the damages element, but I just want to differentiate that RICO standing is different from Article III standing. RICO standing is not jurisdictional, and so we're definitely talking about the merits here, and that is something that the district court just never reached. We did argue that the cost of plaintiffs incurred was... We did argue that to the district court in the briefs below, but we just don't know how the district court would have ruled on it. Let me ask you about your claim that this was state action because three of your causes of action require state action, don't they? I believe the... Government action. The First Amendment claim, the Equal Protection Claim do, and to the extent that you need an injury for the Common Law Conspiracy Claim, then I indirectly guess the third one as well. So what's the evidence that Dominion's actions were induced by the government? We just had a Fifth Circuit case finding that some of the... Some companies suppressed their speech, and it was encouraged by the government, but we have no evidence like that here that I saw. It's speculative, is it not? I don't believe it's speculative. I believe you're referring to the Missouri v. Biden case, and that case was decided on a preliminary injunction with actually a more developed evidentiary record. I think the bar for us goes up once we get past the motion to dismiss, and we do need to put on some evidence that will allow that... Well, we need to allege stuff. Well, but I think the standard we're bound to now is that we have to allege plausible facts that support a reasonable inference in our favor. It doesn't have to be the only reasonable inference. It doesn't have to be the most reasonable inference. It just has to be a reasonable inference. And the facts that we have alleged, and I think the other thing that the case law shows, is that you look at the context of the complaint. You don't look at specific individual allegations. You look at the entire context of the complaint. And if you look at the complaint and the allegations, there are a number of things that together support a reasonable inference that Dominion was acting on behalf of the state. What is the conduct precisely for your state action argument? I'm sorry, ma'am? What is the conduct precisely for your state action argument? The conduct as we see it is the sending of letters. The sending of the letters by Dominion was the conduct because the letters were intended, number one, it was intended for two purposes, one of which has become clear in the briefing before this court. But the first purpose was that it was to support the government's narrative about the election being the most secure election in history and that all these allegations of irregularities were wrong. That is a government interest. Now, that's not a test for state action, but it is a fact, the fact that Dominion is, Dominion with no interest of its own in these lawsuits is sending letters threatening people who are giving testimony in these lawsuits is a fact from which you can reasonably infer Dominion is acting on behalf of the defendants in the lawsuits, which is the state, the state of Michigan specifically. So there's certainly a reasonable inference. Now, I fully concede that we'll have to put on more evidence to get past summary judgment, but at the motion to dismiss stage where all we're supposed to do is allege plausible facts that support a reasonable inference that the elements of our causes of action exist, I think we've satisfied that standard with this complaint, including with the state action allegations. Thank you. Thank you, sir. Thank you. Good morning. David Metschke on behalf of the Appalese, U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Hamilton Place Strategies, LLC. May it please the court. We are here today to discuss another lawsuit stemming from the 2020 election. I know we're not here to discuss the election results or anything, but that is the context of this case. Dominion is a private company. It develops and supplies election technology and equipment. It's a vendor, and it contracts with, for example, state and local governments for those products. As the court is aware, in the aftermath of the 2020 election, in those several months afterwards, Dominion was subject to numerous accusations that it was rigging the election results. If Dominion's machines are seen as flawed, biased, or worse, it could lose those contracts. The appellants here, Michigan poll watchers, signed affidavits that were submitted as exhibits in lawsuits seeking to overturn the election results in Michigan. Each appellant then received a single letter informing them to, as was already discussed, not to fame Dominion and to preserve relevant documents for future defamation cases. This was the only letter sent. While Dominion did not file a lawsuit against the appellants, it did file defamation lawsuits against others, which thus far resulted in hundreds of millions of dollars in settlements. Appellants filed this lawsuit about 10 months later, alleging that Dominion was seeking to stifle the national debate about the election. Based off of that one letter, one form letter, appellants have filed a wide-ranging lawsuit with claims for deprivation of their equal protection rights, violations of the First Amendment, RICO violations, and civil conspiracy. I first want to address the question that Judge Potsman asked opposing counsel, and specifically the cartoons case. The cartoons case, and I am someone who did collect baseball cards as a youth, so I do like that case. That case, though, does not discuss standing at all. It's not a standing case. And the reason it's not a standing case is that case, the claim at issue was a tortious interference with contract. It's a very different case than the case we have here. And moving forward, and to address what Judge Morris was asking, the real concern here with standing is the lack of allegations. What the district court did below, which Judge Bremer did, was he combed through the complaint, tried to find what was an injuring fact that was alleged in the complaint. He found four. And then when it came to the chilling or silencing of speech, found two important things associated with that. One, as has already been discussed today, the appellants didn't allege that they were going to say something, but didn't after receiving that one single letter. And the second piece stemming from that, and it's throughout the complaint, is that for some reason the minion sending the letter, or even broader, the minion's actions may be associated with others or something, were stifling that national debate. And that's a generalized grievance. That's something that, as Chief Judge Bremer noticed, is alleged in the complaint as affecting every American. And that cannot suffice for standing. I also want to address, real quickly, a maybe misconception about how state action is assessed on appeal  And there's a recent case involving the Alta ski area, which I believe several members of this panel sat on that case. In that case, just like this case, there were allegations that Alta ski area was a state actor because of its association with national forest land, and there was an equal protection claim that was asserted by snowboarders, because as some of us skiers are aware, Alta does not allow snowboarding at its mountain. And on appeal, this court looked through and assessed the state action under the four tests, those four Gallagher tests, and looked at the actual conduct that was alleged, and specifically did not say you can simply try to infer that there was state action based off of the complaint. And that's an important point here, and that's the elephant really in the room for this. Now, the standing analysis can get difficult when you're looking at reasonable inferences, especially when it comes to intangible harms. But the elephant is that state action. The conduct that was alleged in this case is not attributable to the state. It's private conduct. Would you agree that Dominion functioned as a state actor for purposes of its role in administering elections? That's not what this case is about. I would just like to know that as sort of a point of departure for thinking about your response to the state action argument. If Dominion's role as a private company and a vendor of that technology and equipment, and facts outside this case, happen to have some action that could be fairly attributable to the state in the four tests, then perhaps. Again, it's not the case here, and there hasn't been a single court yet to rule that Dominion is a state actor in any of its actions. So taking that just a step further, so if Dominion, just for sake of argument, could be construed as a state actor given its relationship with the state for purposes of its role as a vendor in the election process, you're not, I think you would agree with me, that not all conduct that Dominion would engage in would constitute state action, even if it's a state actor in that limited way. Is that a fair understanding? Yes, and that goes directly to that public function test. And that's really what was alleged in the complaint. If you look at the complaint, it essentially says, in multiple allegations, because Dominion played a role in the election, therefore is a state actor as to that, and ergo is a state actor as to all its other actions. And that is far afield from the four tests for state action that this court assesses under. Go ahead. Go ahead. I was thinking I did not pose a question. I see that. And I know, Judge Hartzell, you asked about that RICO injury. And I just want to be clear. To get to the RICO claim, which fails because there is not that RICO standing, the RICO injury to the business and property, to get to that RICO claim, you'd have to first have standing, which the appellants do not have standing. And then that claim only becomes at issue because of the lack of state action on the other ones. You get down to that RICO claim, and that would be the one left. But again, that one's been briefed at the motion-dismiss stage. And if this court were to find standing, that RICO injury is something that this court could affirm on other grounds for. Counsel, why was the district court, so you could speak to the district court's conclusion on imminence, why was that a correct understanding that the nine-month delay should be viewed as undermining the sort of imminence component of the standing inquiry? Yeah, and that goes to that threat of litigation that was alleged in the complaint. That threat needs to have something more to it than just, you know, I was threatened with litigation, now I'm scared, I'm distressed, something like that. And that's where that imminence comes in, it's that extra little bit to take it out of the context that this court was talking about a little bit earlier with the Shields case and everything. And what Chief Judge Berman did below is he said, look, we're after nine months here, almost ten months, any fear of litigation is gone, and he filed it. He waited that long to file it. But why would the fear of litigation be gone at that point? It seems like an arbitrary number. I mean, it's within the statute of limitations for filing an action. I'm just not sure why that is necessarily correct. And that goes back to the letter. The letter that is sent, when you look at the full breadth of the letter, the letter is saying there has been accusations against the minion, defamation lawsuits are going to be filed here soon against others, not the appellants, please preserve documents and refrain from defaming the minion. After nine months, and there's been actual defamation suits filed against those others, that fear goes away. If they were going to be brought into that, they would have received more communication. They would have had a lawsuit filed against them. And when you look at it in the context of that letter. I'm not sure where that's coming from other than your own personal opinion. If you're an individual who gets one of these letters, it seems threatening and seems to threaten litigation. Why would you possibly think, especially when there are other lawsuits being filed, why would you possibly think that nine months is some sort of an important deadline where there's no chance that you're going to be a party to a suit after that? Why wouldn't you think just the opposite? There's lawsuits being filed all over the place and they threaten litigation. It's going to happen to me. I think a couple of things there. One, time makes a difference. There was a flurry of litigation right around that winter time period of 2020. Then we're talking about almost a whole year after the actual election. And again, looking at that context of that letter, if you receive a letter and you're expecting, okay, maybe I have to preserve some documents or anything and you don't receive any follow-up, eventually that letter is going to be out of line. Well, assume we disagree with you that there is reason to believe or they allege that they have reason to believe, have continuing fear of litigation after nine months. What does that mean for your standing? Well, in terms of whether the appellants have standing? Right. So if that's an intangible harm here that the court is going to recognize, and I understand that there's some discretion with intangible harms in looking at that, then it goes, and that suffices for one or several of the claims, then there's still that state action concern. I understand that. I'm just talking about for standing. Do you think if there's a viable or reasonable allegation of a threat of litigation or fear of a threat of litigation, is that sufficient on its own to confer standing? It has to have that context around it. So if it's an intangible harm here that is sufficiently close to one that's been recognized by this court, I'm not sure I've seen an exact case on that, then it could. But in this case, again, looking at, and I go back to what Judge Rossman stated at the very beginning here, these are pre-litigation actions that are taken. This is correspondence. We're looking at a little bit different context than someone, you know, a lawyer looking at someone saying, we're going to sue you tomorrow. It's a different context, and that's, again, when you're looking at intangible harms, you have to assess how does this compare to intangible harms that have been recognized by the court in other cases. What was the purpose of the letter if it wasn't to induce great distress on the  What other purpose could there have been? A strong business purpose. Well, go ahead. I'm not sure that's a distinction, but go ahead. Well, it's that strong business purpose of, and again, going back to what I said in my opening, that the minions hold business within their attack. And granted, there is some interest that may be shared with various governmental entities. I don't know which ones. Appellants never actually pledged which government would be interested, had the same interest as the minion. But the minion has a strong interest in having the public know the record straight, know that, you know, the minion is not associated with Venezuelan dictators. So that's the reason they send it, but what are they trying to do? They're trying to frighten, at the least, the recipients into silence. And I have a hard time not seeing that as a protectable interest, in terms of standing. We have anti-SLAPP legislation. That was to stop this sort of conduct, presumably because that sort of litigation could have occurred otherwise. Doesn't that indicate that there's a claim here? We may disagree a little bit on the scope of the letter, that there also is that interest in preserving the documents. We may disagree a great deal. I can't think of anything more disturbing than to be accused by a large corporation of misconduct when you did nothing along those lines. That's scary. It's worse than being accused of something you did. I don't know if you've ever been accused of something you had nothing to do with, but that's pretty traumatic. And I'd hate to think that that's not a legally protectable interest. The harm. Go ahead. Oh, please finish. No, I'm ready to hear your response. I remember you were giving me flashbacks back in third grade when I was accused of cheating on a test. I mean, I hear you on that. The harm still has to be distinct and palatable, and that's really not played in this case. There's a tort for causing extreme emotional distress. What has to be added to that to make it a legally protectable interest? That's not the claim here, but we don't care what the claim is. That's what the grand jury case stands for. I think that if it's a harm that's been recognized for other causes of action, it's a legally protectable interest. Why isn't this sufficiently analogous to that tort to provide a legally protectable interest? I think it goes back to the discussion that was earlier about if there's confusion, that emotional distress, there needs to be some action associated with that, and that's not alleged. In the tort, does there have to be an action? If someone's claiming that the defendant committed the tort of causing extreme emotional distress, does the plaintiff have to do something in that case? I'm not aware of that being an element of that cause of action. That goes to extreme emotional distress, and that's not alleged in the complaint. I understand that maybe there's a possibility that someone receiving a letter like this could have it. You don't think this is sufficiently analogous to it? I think if there was more allegations pled, it could be, but based on the Did you challenge standing below? Yes. We challenged standing, due disability, also ripeness. It's a long complaint, and so various due disability concerns were challenged. On the government action issue, the plaintiff said they could develop their own, but why isn't the complaint enough to justify allowing the case to proceed, and then during the discovery phase, they might show that there was communication between Dominion and state actors, state officials encouraging this, letting Dominion intimidate people rather than the state doing that. What's wrong with their argument on that score? A couple of reasons. One is what this court has done in other cases such as the Alpha case I just mentioned, looking at the four tests, whether that is adequately pled at the motion to dismiss stage. Second, if there were any such facts that could be alleged, the appellants would have mentioned that in the briefs. The briefs are absent of anything. It's all inferences. They're saying they haven't had the discovery, which would be needed. I'm not sure exactly how they discovered, how they made the claims that the Fifth Circuit to hold in favor of the plaintiffs in that case, but presumably that was discovery of emails and other communications that you wouldn't have at the time of the complaint. You wouldn't have any access to that. There won't be any. I mean, there's just not facts out there that could somehow take the challenge conduct, the sending of the letter, and place that into an area where it could be reasonably attributed to the state. Well, if government officials had requested it, if you wanted to keep your contract for the next election, you'll do this. There's zero evidence of that. And I'm not suggesting there's any evidence of that. But that would change the nature of the claim, would it not? Wouldn't that show state action? It certainly would change the nature of the claim. You'd still have to judge whether that meets the forecast for state action. Do you have something further? I'll give you a minute for rebuttal then. All right. Well, I believe you can take time to close your argument. I was just going to mention, Your Honor, that I believe the request that this court affirm the district court's dismissal of all claims. Thank you, Your Honor. I'd just like to first address the general grievance issue. This is not a generalized grievance because these people received letters that had their names on it. If I brought the case because I don't like dominion-threatening people, that would be a generalized grievance. But people receiving letters from dominion, that's not a generalized grievance. As far as the eminence component of the standing inquiry, I think that might be an issue if the only injury for purposes of standing that we were asserting was the fear of being sued in the future. Now, certainly one of the injuries to the plaintiffs was that. But the injuries that were actually completed when they received the letters were perhaps sufficient to give them standing under the cases we cited. I'd be happy to answer any other questions the court has for me. I'm curious what the pleadings show about the extent of emotional distress because I think counsel was correct that you really don't plead the sort of extraordinary emotional distress that might support a court claim. I would direct the court back to specifically the allegations pertaining to some of the plaintiffs that own small businesses. They're very poignant. I mean, there are allegations that what occurred to these people was how are they going to survive ruinous litigation? Is this going to destroy my small business? Are people going to know where I live when I get sued? I mean, these articulations of the thoughts that went through people's minds when they received these letters very much support the idea that this was a traumatic thing to receive, these letters. And I think that they are at least as strong as the allegations that were and saw that he was included on a watch list and was confused and distressed. I mean, our allegations are much stronger than that, frankly, because obviously being accused of being a terrorist. Did the court actually state that that distress created standing? They upheld his standing with reference to his allegations that he experienced confusion and distress. That's the way we read the case. But wasn't the existence of, like, a specific statutory framework kind of tipping the balance in TransUnion, Lupia, those sorts of cases? No? I don't think so, because I think the issue in those cases really was whether does the violation of the statute itself give you standing, and the court's analysis was that no, it doesn't. You have to actually have an injury. But the Congress has recognized the harm. Certainly a statute itself is not the basis alone, but that informs the inquiry, and you don't have that here. Well, we don't have a statute that says you can't threaten people. We do have all kinds of common law, but there's extortion statutes. There's witness retaliation and intimidation. Those are federal crimes. So we do have laws that we believe this violated in conjunction with the emotional distress that people perceive when they receive letters in violation of those laws, you know, according to our allegations. But I think it's important that the injury has to be one that has been traditionally recognized as actionable. That's, I think, the bottom line for a standing injury. You can't just create something new, but if it does bear some kind of similarity, it doesn't have to be an exact duplicate, but if it does bear some similarity to an injury that has traditionally been actionable, then you have an injury that gives you standing. And many cases of this court have shown that that is a very distinct inquiry from the legal theory that you're going to be asserting to prove wrongfulness of the conduct that caused that standing injury. So the wrongfulness could be under any legal theory of wrongfulness. It doesn't have to relate to the actual injury. It just has to relate to the conduct that caused the injury. And so that distinctness is why, if you take the traditional court of emotional distress, the reaction these people had when they received the under transunion, it's not an exact duplicate, but it's very similar. And the wrongfulness we assert under the other claims. So thank you, Your Honor. We request reversal. Thank you. Thank you, counsel. The case is submitted. Counsel are excused. We'll take the next.